UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IMAGINE MEDISPA, LLC,
f/k/a MEDICAL WEIGHT LOSS CLINIC
OF CHARLESTON, LLC,
and DAVID A. RUBIO,

       Plaintiffs,

v.                      Civil Action No. 2:13-26923

TRANSFORMATIONS, INC.
a West Virginia Corporation,
formerly doing business as
Transformations Weight Loss &
Skin Clinic, Inc., formerly doing
Business as Bariatric Medicine
of Huntington, Inc.,
and LIZA ANTOINETTE FREDERICK, M.D.
a/k/a TONI GALBRAITH, M.D.,
and JOSHUA P. GALBRAITH,

       Defendants.

MEMORANDUM OPINION & ORDER

       Pending is the defendants' motion to dismiss, filed December 20, 2013.


I. Factual and Procedural Background


       This case arises out of a dispute between two competitors in the medical weight-loss and skin care industry, each of which provides "highly similar goods and services in overlapping geographic areas." See Compl. ¶¶ 13-14. Plaintiff

Imagine Medispa, LLC ("Imagine"), a West Virginia corporation
with its principal place of business in Charleston, West
Virginia, provides "medical weight loss and skin care services .
. . . through the provision of diet drug therapies[,]
exercise[,] and through nutritional counseling." Id. ¶¶ 1, 9,
10.  Plaintiff David Rubio is a West Virginia resident and the
owner of Imagine.  Id. ¶ 2.  Transformations, Inc.
("Transformations") is a West Virginia corporation with its
principal place of business in South Charleston, West Virginia.
Id. ¶ 3.  Like Imagine, Transformations also provides "medical
weight loss and skin care services . . . . through the provision
of diet drug therapies[,] exercise[,] and through nutritional
counseling." Id. ¶¶ 11, 12.  Defendant Joshua Galbraith is a
West Virginia resident and "an incorporator and officer of
Transformations." Id. ¶ 5.  Defendant Liza Antoinette
Frederick, M.D., is also a West Virginia resident, and was "an
incorporator" of Bariatric Medicine of Huntington, Inc.,
Transformations' predecessor-in-interest.  Id. ¶ 4.  The
plaintiffs allege that she is now an officer of Transformations.
Id.  Both Imagine and Transformations operate in southern West
Virginia.  Id. ¶¶ 9, 11.

A.

In their complaint, the plaintiffs contend that the
defendants have engaged in a variety of unfair business
practices over the course of several years.

First, the plaintiffs allege that the defendants
knowingly published false advertisements touting
Transformations' competitive prices for certain services in 2010
and 2011.  Specifically, they claim that, beginning in November
of 2010 and continuing throughout 2011, the defendants
distributed promotional materials and advertisements through
Valpak[1] claiming that Transformations was "West Virginia's Lowest
Price Weight Loss & Skin Care Clinic."  Id. ¶¶ 15-16.  In April
of 2011, the defendants distributed a coupon through Kroger
which similarly claimed that Transformations had the "Lowest
Prices in WV!".  Id. ¶¶ 17-18.  Both advertisements were
distributed in interstate commerce and received by "thousands of
persons."  Id. ¶¶ 19-21.  The plaintiffs contend, however, that
each quoted statement was "literally false," id. ¶¶ 31-32; that
Transformations' prices are, in fact, "not the lowest in West
Virginia," id. ¶ 29; and that "Imagine's prices for

---

[1] Valpak is a "direct marketing" company that mails coupons to
households throughout the United States.  See About Valpak,
http://www.coxtarget.com/corp/about.html.

3

substantially identical products and services are lower than the prices offered by" Transformations, id. ¶ 30.  In addition to these specific advertisements, the plaintiffs also allege that the defendants have "produced and caused to be aired false and misleading television and radio advertisements concerning their services," id. ¶ 22; and that the defendants "falsely advertised that they offered three weight loss drugs for $65.00 when in fact two of the so-called drugs offered were merely an over-the-counter nutritional supplement and a diuretic," id. ¶ 26.  The complaint does not disclose when these advertisements were made, or how the advertisement for the weight loss drugs was distributed.

Next, the plaintiffs claim that the defendants engaged in fraudulent or misleading use of online social media websites such as Facebook and Craigslist.  See generally id. ¶¶ 23-24. According to the complaint, the defendants created a fictitious or misleading Facebook Profile using Rubio's name.  Id. ¶ 23. The Profile falsely stated that Rubio was a former employee of Imagine, and indicated that Rubio "liked" Transformations.[2]  Id. The plaintiffs assert that the defendants also created a fictitious advertisement for a 2010 Chevrolet Camaro that was

---

[2] The complaint does not explain when the fictitious profile was created.

posted on the online marketplace Craigslist.  The listing named
Rubio as the seller and included Rubio's office telephone
number, resulting in Rubio receiving "scores of calls from
individuals inquiring about [a] Camaro that [wa]s not owned or
for sale by" Rubio.[3]  Id. ¶ 24.

        Finally, the plaintiffs allege that the defendants
"contacted Imagine employees in an effort to learn trade secrets
or other confidential information and/or to lure some of those
employees away," id. ¶ 25, and also "falsely told Imagine's
clients and potential clients that Imagine used unlicensed
doctors and had to change its name due to issues with the
authorities," id. ¶ 27.[4]

---

[3] Later in the complaint, the plaintiffs allege that the
advertisement caused "unknown, unsolicited individuals to call
[Rubio's] personal home number (which is publicly listed) at all
hours of the day and night inquiring about [the] Camaro[.]"
Compl. ¶ 59.  It is unclear whether the advertisement listed
Rubio's home or office telephone number.

[4] In Paragraph 28 of the complaint, the plaintiffs claim that
"[b]y the business arrangements herein, defendant Frederick
is[,] and continues to be[,] in violation of an Amended Consent
Order entered on June 7, 2013 by the West Virginia Board of
Medicine."  The referenced consent order was not attached to the
complaint, and the complaint provided no additional context for
this assertion.

B.

Plaintiffs assert that the false advertisements and fictitious Facebook Profile have directed clients and potential customers away from Imagine and towards Transformations, and "lessen[ed] . . . the good will associated with Imagine's goods and services." Id. ¶¶ 23, 34, 41. They similarly contend that the Craigslist advertisement was "clearly and intentionally designed to be harassing to [Rubio] and disruptive to his personal life and professional business as owner of [Imagine]." Id. ¶ 24. On October 26, 2013, they commenced this suit, charging the defendants with false advertising and unfair practices in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I), tortious interference with contract or business relationship (Count II), defamation (Count III), and invasion of privacy (Count IV).

The defendants moved to dismiss on December 20, 2013, arguing that the well-pleaded facts in the complaint failed to state any claim upon which relief could be granted; alternatively, they argued that the plaintiffs' claims were time-barred by the applicable statutes of limitation. See generally Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs.' Mem.").

In response to the motion to dismiss, the plaintiffs introduced a number of new factual allegations and exhibits that were not included in the complaint.  They clarified, for example, that Rubio first discovered the fictitious Facebook Profile in his name sometime after June 12, 2013, and that he first began receiving telephone calls regarding the 2010 Camaro in October of 2013.  Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pls.' Opp'n") at 2.

The plaintiffs also alleged, for the first time, that the defendants created a second fictitious Facebook Page under the name "Imagine Medispa."  See id. at 3-4.  They claim that the fictitious Page improperly used Imagine's trademark, and that the defendants used the Page to fraudulently induce Facebook members, including an Imagine employee named Amy Lively, as well as Imagine patients, to "Like" Transformations' Facebook Page.  Specifically, the plaintiffs assert that the defendants used the fictitious Page to send "friend requests," to Facebook members that, once accepted, added the recipients to the list of "friends" affiliated with Transformations' Facebook Page.  Id.

The plaintiffs did not move to amend their complaint to include these new allegations or exhibits, and the court will

not consider them for the purposes of resolving the pending motion to dismiss. Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) ("In resolving a motion pursuant to Rule 12(b)(6) or Rule 12(c), a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment."); Materson v. Stokes, 166 F.R.D. 368, 370 (E.D. Va. 1996) (refusing to consider new allegations contained in response to motion to dismiss where plaintiff had not amended his complaint).

## II. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing ... entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957),

overruled on other grounds, Twombly, 550 U.S. at 563); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).

Application of the Rule 12(b)(6) standard requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" Erickson, 551 U.S. at 93-94 (quoting Twombly, 550 U.S. at 555-56); see also South Carolina Dep't of Health & Envtl. Control v. Commerce and Indus. Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)).  The court must also "draw[] all reasonable . . . inferences from th[e] facts in the plaintiff's favor . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

III. Discussion

A. Count I: Lanham Act Claims

        In Count I, the plaintiffs generally contend that, "by
the acts complained of" in the complaint, the defendants have
"committed unfair competition in violation of 15 U.S.C.
§ 1125(a)."  Compl. ¶ 39.  Section 1125(a) of the Lanham Act
provides that:

> (1) Any person who, or in connection with any goods or
> services . . . uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading
> description of fact, or false or misleading
> representation of fact, which--
>
>   (A) is likely to cause confusion, or to cause
>   mistake, or to deceive as to the affiliation,
>   connection, or association of such person with
>   another person, or as to the origin, sponsorship,
>   or approval of his or her goods, services, or
>   commercial activities by another person, or
>
>   (B) in commercial advertising or promotion,
>   misrepresents the nature, characteristics,
>   qualities, or geographic origin of his or her or
>   another person's goods, services or commercial
>   activities,
>
> shall be liable in a civil action by any person who
> believes that he or she is likely to be damaged by
> such act.

15 U.S.C. § 1125(a)(1)(A), (B).  Parsing the allegations in the
complaint more closely, the plaintiffs appear to allege a claim
for false advertising arising out of the Valpak and Kroger

10

advertisements, and a claim for "false endorsement" arising out of the creation of the fictitious Rubio Facebook Profile.

### 1. False Advertising

A claim for false advertising under the Lanham Act is governed by § 1125(a)(1)(B), which prohibits the use of a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B). As our court of appeals has explained, a plaintiff asserting a claim for false advertising under § 1125(a)(1)(B) must establish that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th
Cir. 2011) (quoting Scotts Co. v. United Indus., 315 F.3d 264,
272 (4th Cir. 2002)).

     The plaintiffs contend that the Valpak and Kroger
advertisements were literally false, Compl. ¶¶ 31-32; were
distributed in interstate commerce and received by thousands of
people, id. ¶¶ 19-21; were "likely to influence the decision of
persons to purchase goods and services," id. ¶ 33; and likely
caused damage to the plaintiffs by "a direct diversion of sales
. . . or a lessening of the good will associated with Imagine's
goods and services," id. ¶ 34.  The defendants maintain that,
even if true, these allegations fail to state a claim for false
advertising, because the challenged statements are non-
actionable "puffery."  Defs.' Mem. at 5-7.

     "Puffery is an exaggeration or overstatement expressed
in broad, vague, and commendatory language." Castrol, Inc. v.
Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993) (holding that the
claim that motor oil provided "longer engine life and better
engine protection" was not puffery); see also Am. Italian Pasta
Co. v. New World Pasta Co., 371 F.3d 387, 390-91 (8th Cir. 2004)
("Puffery exists in two general forms: (1) exaggerated
statements of bluster or boast upon which no reasonable consumer
would rely; and (2) vague or highly subjective claims of product

superiority, including bald assertions of superiority."). Several courts have concluded that bald assertions of price superiority constitute puffery if they are so sufficiently general that a consumer is unlikely to rely on the statement. See, e.g., Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 245-46 (9th Cir. 1990) (holding that statement "we're the low cost commercial collection experts" was puffery despite implication that defendant provided comparable services at lower rates than attorneys operating in same industry); Procter & Gamble Co. v. Kimberly-Clark Corp., 569 F. Supp. 2d 796, 799 (E.D. Wisc. 2008) ("When an advertiser claims his store [] has the 'lowest' prices or [best product], no one expects that consumers will take his claim at face value[.]"); Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics, 905 F. Supp. 169, 182 (S.D.N.Y. 1995) (holding that statements such as "most cost-effective prices" and "subscription prices as low as possible" were mere puffery). The statements at issue here -- "West Virginia's Lowest Price Weight Loss and Skin Care Clinic" and "Lowest Prices in WV!" -- do not refer to any specific services or products, and draw no direct comparison to Imagine or any other competitor. Rather, both statements are broad, vague exaggerations or boasts on which no reasonable consumer would rely.

13

The plaintiffs' remaining false advertising allegations also fail to state a claim upon which relief can be granted. Specifically, the plaintiffs' assertion that the defendants falsely advertised "three weight loss drugs for $65.00" fails because the plaintiffs do not allege that the advertisement was distributed in interstate commerce. And the plaintiffs' claim that the defendants "produced and caused to be aired false and misleading television and radio advertisements concerning their services" is nothing but a conclusory allegation that fails to plead several of the necessary elements of a Lanham Act false advertising claim articulated above. Accordingly, the plaintiffs' Lanham Act false advertising claims based on these statements are dismissed.

### 2. False Endorsement

A "false endorsement" claim may arise under § 1125(a)(1)(A) of the Lanham Act if a plaintiff's identity is connected with a product or service in a way that is likely to mislead consumers into thinking that the plaintiff approves of or sponsors the product or service. AvePoint, Inc. v. Power Tools, Inc., --F. Supp. 2d--, No. 13-35, 2013 WL 5963034, at *14 (W.D. Va. Nov. 7, 2013) (citing Maremont v. Susan Fredman Design Grp., Ltd., 772 F. Supp. 2d 967, 971 (N.D. Ill. 2011) ("False

14

endorsement occurs when a person's identity is connected with a
product or service in such a way that consumers are likely to be
misled about that person's sponsorship or approval of the
product or service." (internal quotation marks and citation
omitted))); see also Advanced Res. Int'l, Inc. v. Tri-Star
Petroleum Co., 4 F.3d 327, 334 (4th Cir. 1993) (noting that
courts have recognized "a § 43(a) injury where the plaintiffs'
voices, uniforms, likenesses, published words, or names were
used in such a way as to deceive the public into believing that
they endorsed, sponsored, or approved of the defendant's
product." (internal citations omitted)).

        In this case, the plaintiffs allege that the
defendants created a fictitious Facebook Profile in the name of
Imagine's owner, David Rubio, and used that Profile to falsely
suggest both that Rubio was a former Imagine employee, and that
Rubio "liked" Transformations.  They also claim that the Profile
"falsely direct[ed] clients and potential customers away from
the plaintiffs and to[wards] the defendants."  Compl. ¶ 23.  The
defendants have not addressed whether the creation of the
fictitious Facebook Profile is actionable under the Lanham Act.

        Although the plaintiffs do not tie their allegations
regarding the Facebook Profile to any specific section of the
Lanham Act, courts have sustained claims for false endorsement

                                15

based on similar facts.  See AvePoint, Inc., 2013 WL 5963034 at
*14 (denying motion to dismiss false endorsement claim where
plaintiff alleged that defendant created a fictitious LinkedIn
profile to sow confusion regarding products and services offered
by plaintiff); Maremont, 772 F. Supp. 2d at 971 (denying motion
to dismiss false endorsement claim where plaintiff, a
professional interior designer, alleged that defendant, a design
competitor, authored fictitious Tweets and Facebook Posts using
plaintiff's accounts).  Accepting the factual allegations in the
complaint as true, and drawing all inferences in the plaintiffs'
favor, it is plausible that the fictitious Facebook Profile
misled Imagine clients and potential customers into thinking
that Rubio was no longer affiliated with Imagine, and that he
instead endorsed Transformations' services.  Accordingly, the
defendants' motion to dismiss Count I in its entirety is denied.


B. Count II: Tortious Interference


        In West Virginia, the elements of a claim for tortious
interference with a contract or business relationship are (1)
"existence of a contractual or business relationship or
expectancy"; (2) an intentional act of interference by a party
outside that relationship or expectancy; (3) causation; and (4)

damages.  See Torbett v. Wheeling Dollar Sav. & Trust, 314 S.E.2d 166, 171-73 (W. Va. 1983).

The plaintiffs claim that "Imagine has a contractual or business relationship with its existing employees and clients as well as potential clients," that the defendants' conduct "intentionally interfered with" those relationships, and that "[s]uch interference has caused harm to Imagine in the loss of business and diminished reputation in the community."  Compl. ¶¶ 44-46.  Specifically, the plaintiffs allege that the defendants "contacted Imagine employees in an effort to learn trade secret[s] or other confidential information and/or to lure some of those employees away from Imagine," id. ¶ 25, and "told Imagine's clients and potential clients that Imagine used unlicensed doctors," id. ¶ 27.

The defendants maintain that the complaint does not include "a sufficient factual basis to establish the prima facie elements for tortious interference," and therefore fails to state a claim to relief that is plausible on its face under any theory.  Defs.' Mem. at 7-9.  Alternatively, they argue that the tortious interference claims are time-barred.

### 1. Interference with Imagine Employees

"Wantonly and maliciously" inducing a competitor's employees to break an employment contract by resigning may give rise to a claim for tortious interference under West Virginia law.  See Thacker Coal & Coke Co. v. Burke, 53 S.E. 161, 162 (W. Va. 1906) ("[I]f one wantonly and maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person, it is actionable." (internal quotation marks omitted)); see also Tiernan v. Charleston Area Med. Ctr., Inc., 506 S.E.2d 578, 591 n.20 (W. Va. 1998) (explaining that claims for tortious interference with an employment relationship are actionable even in the context of an at-will employment relationship); C.W. Dev., Inc. v. Structures, Inc. of W. Va., 408 S.E.2d 41, 45 (W. Va. 1991) (per curiam) ("[W]hen a servant is enticed to desert service by another, malice is inferred from the wrongful character of the act[.]" (internal quotation marks, citations, alterations, and emphasis omitted)).  And it follows from this general principle that enticing a competitor's employees to breach their fiduciary duty to their employer by disclosing trade secrets or other confidential information may also provide the basis for a tortious interference claim.  See Torbett, 314 S.E.2d at 169 (noting that "confidential information unique to

an employer, customer lists generated by it, or trade secrets"
all constitute "protectable employer interest[s]").

In this case, the plaintiffs allege that the
defendants "contacted Imagine employees in an effort to learn
trade secret[s] or other confidential information and/or to lure
some of those employees away from Imagine," Compl. ¶ 25, but
they do not claim that the defendants were successful in
obtaining any confidential information or in enticing any
Imagine employees to leave their employment.  As a result,
although the complaint asserts that the defendants' tortious
interference "caused harm to Imagine in the loss of business and
diminished reputation in the community," Compl. ¶¶ 44-46, it is
unclear how the defendants' apparently unsuccessful attempts to
obtain information or poach Imagine employees caused these
harms.  The plaintiffs do not allege, for example, that they
were required to undertake any efforts -- financial or otherwise
-- to persuade Imagine employees not to defect, nor do they
claim that the defendants' entreaties caused any reduction in
the productivity of Imagine's workforce.

Some link between the challenged conduct and the harms
alleged is a necessary element of the plaintiffs' tortious
interference claim.  IVS Hydro, Inc. v. Robinson, No. 01-1296,
slip op. at 7 (S.D. W. Va. May 29, 2003) (denying claim for

19

tortious interference because plaintiffs established no causal link between defendants' successful effort to poach employees and any loss in business or revenue due to insufficient personnel), <u>aff'd</u>, 93 F. App'x 521, 526 n.6 (4th Cir. 2004) ("We have reviewed [the] arguments attacking the district court's grant of summary judgment . . . on . . . [the] claims for tortious interference with contract and find those arguments to be without merit."). Although the plaintiffs need not prove a link between the damages they complain of and defendants' alleged misconduct at the motion to dismiss stage, they must at least allege some fact that would allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678-79 (2009). Having failed to plead any fact that connects the defendants' unsuccessful attempts to obtain information or poach Imagine employees to the claimed loss in business and reputational harms, the court cannot draw the inference that the defendants are liable. Accordingly, the plaintiffs' claim for tortious interference based on the allegation that the defendants "contacted Imagine employees in an effort to learn trade secret[s] or other confidential information and/or to lure some of those employees away from Imagine" is dismissed without prejudice to raising the issue anew within the framework of this action.

## 2. Statements to Imagine Clients

The West Virginia Supreme Court of Appeals has recognized that statements by a defendant that destroy a healthcare provider's relationship with existing and potential patients can be sufficient grounds for a tortious interference claim.  See Garrison v. Herbert J. Thomas Mem'l Hosp. Ass'n, 438 S.E.2d 6, 14-15 (W. Va. 1993) (suggesting that hospital administrator's statements regarding doctor's disciplinary record, which destroyed doctor's relationship with patients and potential patients, provided sufficient basis to state a claim for tortious interference).

Although the plaintiffs' factual allegations are relatively thin, they do allege that the defendants made damaging statements to existing Imagine clients, and that those statements resulted in a loss of business.  Accepting the factual allegations in the complaint as true, and drawing all inferences in the plaintiffs' favor, it is plausible that existing Imagine clients, who were told that Imagine was using unlicensed doctors, could have been deterred from continuing to use Imagine's services, thereby resulting in a loss of business. Accordingly, the defendants' motion to dismiss the tortious interference claim based on these statements is denied.

21

### 3. Statute of Limitations

The defendants maintain that, to the extent that any of the plaintiffs' tortious interference claims are plausible, they are nevertheless barred by the applicable two-year statute of limitations.  Defs.' Mem. at 13-15; see also Garrison, 438 S.E.2d at 14-15 (describing applicable statute of limitations). They note that the "latest date of alleged [mis]conduct" contained in the complaint refers to the advertisement issued in April 2011, and argue that the limitations period for all of the plaintiffs' claims therefore expired, at the latest, in April 2013, several months before the complaint was filed.  Defs.' Mem. at 15.

A plaintiff generally need not plead compliance with the statute of limitations.  Cf. Zenith Radio Corp. v. Hazeltine Research., Inc., 401 U.S. 321, 334 (1971) (holding that plaintiff need not anticipate a limitations defense in his pleadings).  But "the statute of limitations as a bar to plaintiffs' cause of action constitutes an affirmative defense and may be raised by motion pursuant to Fed. R. Civ. P. 12(b)(6), if the time bar is apparent on the face of the complaint."  Dean v. Pilgrim's Pride Corp., 395 F.3d 471, 474 (4th Cir. 2005).  The complaint does not clearly explain when

the alleged tortious interference occurred, and it is not
"apparent on the face of the complaint" that those claims are
time barred.

* * *

Based on the foregoing analysis, the motion to dismiss
Count II is granted in-part and denied in-part. Specifically,
the plaintiffs' allegation that the defendants unsuccessfully
attempted to obtain confidential information or poach Imagine
employees fails to state a claim for tortious interference and
is therefore dismissed without prejudice. On the other hand,
the plaintiffs' allegation that the defendants made damaging
statements to existing Imagine clients does state a claim for
tortious interference, and it is not apparent from the face of
the complaint that the claim is time barred. Accordingly, the
plaintiffs may proceed on that theory.

C. Count III: Defamation

The elements of a claim for defamation in West
Virginia are "(1) defamatory statements; (2) a nonprivileged
communication to a third party; (3) falsity; (4) reference to
the plaintiff; (5) at least negligence on the part of the
publisher; and (6) resulting injury." Crump v. Beckley

23

Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1983).  Defamatory
statements are those that tend to "harm the reputation of
another as to lower him in the estimation of the community or to
deter third persons from associating or dealing with him."  Id.

        The plaintiffs' Count III claim for defamation appears
to be directed solely at defendant Galbraith, and, like Count
II, it appears to be predicated on two separate sets of factual
allegations.  Specifically, the plaintiffs allege that
"Galbraith [] made . . . defamatory statements against [Rubio],"
by (1) "establishing a false advertisement . . . for the sale of
a Camaro," and (2) "t[elling] people that Rubio has had trouble
with the authorities."  Compl. ¶¶ 51-52.  The complaint does not
specify when the statement regarding Rubio's troubles with the
authorities was made, but the plaintiffs do allege that Rubio
has suffered dignitary and pecuniary harms as a result of "both
the oral and written defamatory statements made by Defendant
Galbraith[.]"  Id. ¶ 57.

        The first allegedly defamatory statement -- that Rubio
owned a Camaro that was for sale -- would not "tend to harm the
reputation of another as to lower him in the estimation of the
community," and therefore does not state a claim for defamation.
The second allegation appears to reference the plaintiffs'
assertion that the "[d]efendants . . . falsely told Imagine's

24

clients and potential clients that Imagine . . . had to change
its name due to issues with the authorities." Compl. ¶ 27.
This statement, if focused on Rubio, would likely be defamatory;
however, the defendants argue that any defamation claim based on
this statement would be time-barred by the applicable one-year
limitations period. As noted above, the complaint does not
specify when the statement concerning Rubio's troubles with the
authorities was made, and, as a result, the statute of
limitations defense is not apparent on the face of the
complaint.

Accordingly, the motion to dismiss Count III is
granted as to the plaintiffs' defamation claim based on the
Craigslist advertisement, but denied as to the plaintiffs'
allegations that Galbraith "told people that Rubio has had
trouble with the authorities."

D. Count IV: Invasion of Privacy

In West Virginia, "[t]he right of privacy, including
the right of an individual to be let alone and to keep secret
his private communications, conversations and affairs, is a
right the unwarranted invasion or violation of which gives rise
to a common law right of action for damages." O'Dell v.

25

*Stegall*, 703 S.E.2d 561, 594 (W. Va. 2010) (quoting Syl. Pt. 1, *Roach v. Harper*, 105 S.E.2d 564 (1958)).  As the West Virginia Supreme Court of Appeals has explained, this right to privacy may be invaded in at least four ways, including "(1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public."  *O'Dell*, 703 S.E.2d at 594 (quoting Syl. Pt. 8, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (1984)).  The plaintiffs appear to argue all four causes of action.

First, plaintiffs assert that the "defendants have created an unreasonable intrusion upon seclusion . . . by causing unknown, unsolicited individuals to call [Rubio] . . . at all hours of the day and night inquiring about a Camaro for sale[.]"  Compl. ¶ 59.  The Second Restatement of Torts (on which the *Crump* Court relied when articulating the contours of the four-part tort of "invasion of privacy") states that although occasional telephone calls cannot constitute an intrusion upon seclusion, repeated, persistent calls at inconvenient hours can.  *See* Restatement (Second) of Torts § 652B cmt. d (1977).  Courts in this district appear to apply that distinction.  *Compare* *Duncan v. JP Morgan Chase Bank, N.A.*,

26

No. 10-1049, 2011 WL 5359698, at *5-6 (S.D. W. Va. Nov. 4, 2011)
(sixty-eight calls made by defendants to plaintiffs was basis
for intrusion upon seclusion claim), with <u>Hutchens v. West Asset</u>
<u>Mgmt., Inc.</u>, No. 11-996, 2013 WL 1337178, at *3 (S.D. W. Va.
Mar. 29, 2013) ("Plaintiffs appear to allege that defendant
invaded their privacy by calling them on the telephone.  The
court cannot see how defendant's actions in this case violate
any right to privacy.").  Nevertheless, the intrusions, whether
by virtue of their persistence or their character, must rise to
the level of what a reasonable person would find "highly
offensive."  <u>See</u> Restatement (Second) of Torts § 652B cmt. d
("It is only when the telephone calls are repeated with such
persistence and frequency as to amount to a course of hounding
the plaintiff, that becomes a substantial burden to his
existence, that his privacy is invaded.").

        Here, the plaintiffs' allege that the defendants
created the advertisement for the Camaro and posted it on
Craigslist,[5] that the advertisement caused Rubio to receive

---

[5] The complaint initially states that the advertisement that
prompted the phone calls regarding the Camaro was posted on
Craigslist.  Compl. ¶ 24 ("Defendants have falsely listed for
sale on Craigslist.org a 2010 Chevy Camaro . . . and included
plaintiff Rubio's office telephone number as a contact number[,
c]ausing plaintiff Rubio . . . to receive scores of calls from
individuals inquiring about the Camaro[.]").  Later, the
plaintiffs allege that defendant Galbraith "establish[ed] a
false advertisement on Facebook for the sale of a Camaro

scores of calls from strangers "at all hours of the day and night," and that the calls caused "annoyance and inconvenience," and were "disruptive" to Rubio's personal life and business. Compl. ¶¶ 24, 59, 63.  These allegations are sufficient at this stage to state a claim for intrusion upon seclusion.

Second, the plaintiffs claim that, by creating the fictitious Facebook Profile in Rubio's name, the defendants "have appropriated plaintiff Rubio's name or likeness."  Compl. ¶ 60.  "In order for a communication to constitute an appropriation, mere publication of a person's name or likeness is not enough, the defendant must take for his own use or benefit the reputation, prestige or commercial standing, public interest or other value associated with the name or likeness published."  Crump, 320 S.E.2d at 86.  In this case, drawing all inferences in the plaintiffs' favor, the complaint appears to allege that the defendants created the fictitious Rubio Profile because he was Imagine's owner and in order to imply that an individual associated with Imagine "liked" Transformations. Accordingly, Count IV states a claim for appropriation.

---

allegedly owned by Rubio providing readers with Rubio's phone number." Id. ¶ 51.  Regardless of where the advertisement was posted, the relevant question is whether the calls received in response to the advertisement worked an intrusion upon Rubio's seclusion.

Finally, the plaintiffs also claim that the creation of the fictitious Facebook Profile in Rubio's name gave unreasonable publicity to Rubio's private life, and unreasonably placed Rubio in a false light.

To state a claim for unreasonable publicity, the plaintiff must show "(1) that there was a public disclosure by the [d]efendant of facts regarding the [p]laintiff; (2) that the facts disclosed were private facts; (3) that the disclosure of such facts is highly offensive and objectionable to a reasonable person of reasonable sensibilities; and (4) that the public has no legitimate interest in the facts disclosed." Davis v. Monsanto Co., 627 F. Supp. 418, 421 (S.D. W. Va. 1986) (citing the Restatement (Second) of Torts and explaining that Crump "explicitly recognized" the Restatement's definition of invasion of privacy).  In this case, the complaint does not allege that the fictitious Facebook Profile disclosed any private facts about Rubio, but rather claims that the defendants used the Profile to spread disinformation about Rubio and Imagine. Accordingly, Count IV fails to state a claim for unreasonable publicity.[6]  See Restatement (Second) of Torts § 652D Special

---

[6] These allegations more closely resemble a claim for defamation or false-light, see Crump, 320 S.E.2d at 87-88 (noting similarities between the causes of action), but the plaintiffs do not appear to rest their defamation claim on these facts, see

Note ("This Section provides for tort liability involving a
judgment for damages for publicity given to <u>true</u> statements of
fact." (emphasis added)); <u>see also</u> <u>Leidholdt v. L.F.P. Inc.</u>, 860
F.2d 890, 895 (9th Cir. 1988) ("[A]n essential element of th[e]
tort [of public disclosure] is that the facts at issue must be
true."); <u>Tyne v. Time Warner Entm't Co., L.P.</u>, 204 F. Supp. 2d
1338, 1344 (M.D. Fla. 2002) (holding that "[i]n a situation
where the 'facts' disclosed in a publication are, in actuality,
false 'the interest invaded is that protected by the defamation
and false-light torts," and no claim for invasion of privacy
based on public disclosure of private facts will lie (quoting
<u>Haynes v. Alfred A. Knopf, Inc.</u>, 8 F.3d 1222, 1230 (7th Cir.
1993))).

On the other hand, a "plaintiff states a claim for
false light invasion of privacy when he demonstrates publicity
which places him in a false light before the public.  For
example, using another's photograph as an illustration for an
article or book with which that person has no reasonable
connection, and which places the person in a false light, is
actionable as an invasion of privacy." <u>Bell v. Nat'l Republican</u>
<u>Cong. Comm.</u>, 187 F. Supp. 2d 605, 617 (S.D. W. Va. 2002) (citing
<u>Crump</u>, 320 S.E.2d at 85-86).  To be actionable, the false light

_____

Compl. ¶¶ 50-57 (referring more narrowly to Galbraith's
statements and the Craigslist advertisement).

must also be "offensive to a reasonable person," and the subject
of "widespread publicity." <u>Crump</u>, 320 S.E.2d at 87-88.  The
plaintiffs allege that the defendants created the fictitious
Facebook Profile in order to associate Rubio's name with
Transformations -- a competitor-business with which he has no
reasonable connection -- for the purpose of suggesting that
Rubio endorsed or "liked" Transformations.  The Profile existed
on the Internet, making it necessarily widespread.  Accordingly,
drawing all reasonable inferences in the plaintiffs' favor,
Count IV states a claim for false light invasion of privacy.

### III. Conclusion

For the foregoing reasons:

1. The motion to dismiss Count I is granted as to the false
   advertising claim but denied as to the false endorsement
   claim;

2. The motion to dismiss Count II is granted without
   prejudice as stated above as to the allegation that the
   defendants "contacted Imagine employees in an effort to
   learn trade secret[s] or other confidential information
   and/or to lure some of those employees away from Imagine,"
   but denied as to the allegation that the defendants "told

31

Imagine's clients and potential clients that Imagine used
unlicensed doctors";

3. The motion to dismiss Count III is granted as to the
allegation concerning the advertisement for the Camaro,
but denied as to the allegation that defendant Galbraith
"told people that Rubio has had trouble with the
authorities"; and

4. The motion to dismiss Count IV is granted as to the claim
for unreasonable publicity, but denied as to the claims
for intrusion upon seclusion, appropriation, and false
light.

The Clerk is directed to forward copies of this
memorandum opinion and order to all counsel of record and any
unrepresented parties.

DATED: February 26, 2014

John T. Copenhaver, Jr.
United States District Judge